for sale, and that he notified Alice Ireland that said sale should not take place, as she was not entitled to letters of administration on this estate, and that he forbade said sale before it was begun on the 31st day of March, 1905. These allegations as to the age, health, mental condition, and inexperience in business affairs of the parties to whom administration was granted, conceding them to be true, do not, in my judgment, constitute any sufficient foundation for the revocation of the letters that have been issued, nor for setting aside the decree granting administration. None of them would have been a legal objection to the issuing of letters in the first instance. Neither youth nor vigor are required of an administratrix, and neither lack of education not amounting to illiteracy, nor weakness of mind not amounting to want of understanding, will suffice to debar one from his right to administer. The affidavit of Mr. Leary, the petitioner's attorney, seems rather to indicate that the administratrix has proceeded with reasonable diligence and intelligence to perform her duties in the administration of the estate. She has caused an inventory to be made, and she has advertised for sale the personal estate of the decedent. The petitioner says that he has not been served with a notice of appraisal; but the petition is verified by his attorney, Mr. Leary, who says that the petitioner is without the county of Saratoga, and it is not improbable that it was by reason of his absence from the county that he received no notice. It seems to me there is no danger to apprehend that the administratrix will give or set aside the bulk of the personal property of the estate to Mary Ireland as exempt, since the question of exemption must be settled by the appraisers and in accordance with law, and the court is able to prevent any unreasonable extension of the statute, as well as any unreasonable expenditure for a tombstone.

It is my opinion, therefore, that the application to set aside the decree and revoke the letters issued to Alice Ireland, and to issue letters to the petitioner, should be denied.

Application denied.

---

(47 Misc. Rep. 560.)

### In re STEVENS.

#### (Surrogate's Court, Washington County. June, 1905.)

**1. LIFE ESTATES—WHAT IS INCOME—UNDIVIDED PROFITS.**

Twenty shares of bank stock, of the par value of $100, had been inventoried by an executor as trustee as of uncertain value. The executor was also a life tenant in part of the estate, and disposed of the entire interest in such stock for $3,500; 20 shares at $100 and $1,500 "surplus and undivided profits." On an intermediate accounting it appeared that no part of the $1,500 represented a premium on the bank stock, nor any increase in its market value, and was not a part of its working capital. *Held*, that it belonged to the life tenants, and not to the remaindermen, and was properly credited to income.

[Ed. Note.—For cases in point, see vol. 33, Cent. Dig. Life Estates, §§ 34, 35; vol. 12, Cent. Dig. Corporations, §§ 569, 586; vol. 49, Cent. Dig. Wills, §§ 1618, 1768–1771.]

**2. EXECUTORS—ACCOUNTING—EXPENSE.**

Where there is nothing in the account of an executor or the evidence showing mismanagement or lack of diligence, such as to require the court

to hold that no part of the expense of an intermediate accounting should be paid by him personally, one-half of the expense should be paid out of the body of the estate and one-half out of the income.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, § 2257.]

In the matter of the intermediate judicial settlement of the accounts of Clark A. Stevens, executor of Franklin Stevens.   Decree rendered.

Abner Robertson (E. H. Peters, of counsel), for executor.
Westfall & Hill, for contesting remaindermen.

DAVIS, S.   This is a proceeding for an intermediate accounting of an executor.   While it is technically a voluntary accounting, made upon the executor's own petition, it is virtually a compulsory accounting, called for by the remaindermen and residuary legatees, as it appears upon the trial of the objections.   By the last will and testament of Franklin Stevens, deceased, the accountant, Clark A. Stevens, was made the executor, and the terms and the language of the will seem to have given him all the powers and functions of a testamentary trustee. Though not named in the will as such, he has, without objection, acted as such trustee.   The executor, Clark A. Stevens, is also named in the will as one of the life tenants in a part of the estate.   The account in this proceeding was filed May 9, 1904, and rendered an account of the executor's proceedings from June 13, 1901, to April 4, 1904.   The written objections that were filed to the account were general in their language, and did not specify any particular item or items that were erroneous and that should be corrected, and not until the examination of the executor on the trial was it developed what the real objections to the account were.

The main and principal objection, however, appears to be that the accountant has credited to the income of the estate "the surplus and undivided profits" of certain bank stock of the Albion County Bank, of Nebraska.   It appears that the appraisers of the estate found 20 shares of $100 each of bank stock in the Albion County Bank of Nebraska, and, not knowing what its value was at the time of the appraisal (which was several years ago), if it had any value at all, it was carried out in the inventory as of "uncertain value."   Later on it was ascertained by the executor that the bank stock was valuable, and he disposed of the entire interest of the estate in the bank for $3,500, to wit, 20 shares of stock at $100 each, and $1,500 "surplus and undivided profits."   It does not appear that the officers of the bank had declared any dividends, but had allowed the earnings of the bank to remain as "surplus and undivided profits," and it was so regarded by all interested in the fund. The $1,500 was no part of the stock, and formed no part of the working capital of the bank.

The question before us for decision is, to whom does this $1,500 belong—to the life tenants or the remaindermen?   Should it be credited to income, and go to the life tenants; or to the corpus of the estate, and go to the remaindermen?   It appears clearly from the evidence in the case that no part of the $1,500 represented premium on the bank stock, nor any increase in its market value.   If that were the case, a different question would be presented, and the contention of the contestants

might be sustained; but the proof shows unmistakably that there had been no increase nor accretions to the capital stock. The $1,500 was surplus and undivided profits. The principle or doctrine that the earnings of bank stock in trust estates, under conditions like those in the case at bar, should be regarded as income and not corpus, and should go to the life tenant and not to the remainderman, seems to have reached the stage of elementary law. Perry on Trusts lays down the rule as follows:

"The question is, to whom stock dividends, so called, belong. Are they income, and belong to the tenant for life; or capital, and belong to the remainderman? By the early English rule, they went with all extra cash dividends of bonuses to the remainderman. This rule has been so far changed that dividends in money which come from the earnings of the capital invested belong to the tenant for life." Section 545.

We find no decision which conflicts with this elementary rule. The examination of a few cases will show that such earnings of stock belong to the life tenant, and not the remainderman.

In Matter of Rogers, 161 N. Y. 108, 55 N. E. 393, a corporation with a capital stock of $300,000, with a business immensely profitable, went into liquidation and sold out its business and plant for $2,750,000, and organized a new corporation with a capital of $3,000,000, and after reorganizing there was $3,000,000 in cash, bank stock, and other property of the old corporation still on hand as earnings of the old corporation. The Court of Appeals held that these earnings belonged to the life tenant in the Rogers will and not to the remaindermen.

In McLouth v. Hunt, 154 N. Y. 180, 48 N. E. 548, 39 L. R. A. 230, an action to procure a judicial construction of a will and for an accounting of a testamentary trustee, the Court of Appeals held:

"When a stock dividend, declared by a corporation and allotted to shares of its original capital stock belonging to a testamentary trust estate, constitutes, as a matter of fact, a distribution of accumulated earnings or profits, it represents income and belongs to the life tenant of the trust estate as between him and the remainderman."

In Stewart v. Phelps, 71 App. Div. 92, 75 N. Y. Supp. 526, cited by the contestant (but we think so far as it may be applied to the case at bar it favors the life tenant), the question seems to have been what constituted dividend, and what accretions to the capital or corpus. It was held:

"That the life beneficiary was entitled to the stock dividend declared by the telegraph company, but that the other mentioned increase in the estate was an accretion to the principal of the trust fund, to which the life beneficiary was not entitled."

In the case of Monson v. New York Sec. & Trust Co., 140 N. Y. 498, 35 N. E. 945, the court went further than in some of the other cases where a similar question was presented, and held:

"That as between the daughters (who were virtually life tenants) and those entitled in remainder, the former were entitled to the benefit of the increase in income and principal."

In Clarkson v. Clarkson, 18 Barb. 646, 647, decided in 1855, the court held, in a case where the gains, profits and income, and proceeds of corporate stock had been invested in new and other stock, that such

new stock belonged to the life tenants and not to the remainderman, and the trustees were decreed to deliver the stock to the life tenants.

In Simpson v. Moore (1859) 30 Barb. 638, the case of Clarkson v. Clarkson, supra, was followed, and, furthermore, it was held that upon the expiration of the bank's charter the dividend of 18 per cent. which the trustees had the option of taking in cash or the same amount in stock in the new bank, that such cash or new stock belonged to the life tenant and not to the remainderman.

In Matter of Woodruff, 1 Tuck. 58, decided in 1865, the surrogate held that extraordinary dividends belonged to the party holding the life interest in the stock upon which such dividends were earned. The same principle was applied in Cogswell v. Cogswell, 2 Edw. Ch. 231, decided in 1834.

In all the cases cited by the counsel of the respective parties that it has been practicable to examine, there seems to be only one case where there has been an attempted departure from the elementary rule as laid down in Perry on Trusts, supra, and as uniformly held in numerous cases. In Lowry v. Farmers' Loan & Trust Co., 30 Misc. Rep. 334, 63 N. Y. Supp. 429, it was held at Special Term that "stock dividends must be added to the corpus, and cannot be paid to the life beneficiary." That decision was reversed by the Appellate Division, reported in 56 App. Div. 408, 67 N. Y. Supp. 759, and the reversal was unanimously sustained by the Court of Appeals in 172 N. Y. 137–142, 64 N. E. 796. In that case it appeared that the Pullman Palace Car Company "by a capitalization of accumulated earnings made and retained in its hands, from time to time, increased its capital stock from $86,200,000 to $100,000,000 and, predicated thereon, made a stock dividend of 10 per cent. to its stockholders," and the distribution was made in the form of stock certificates, instead of money. The court held "that the stock certificates belonged to the life tenant, and not to the remainderman." In view of the long line of authorities that might be cited, in addition to those already cited, I do not see how the contention of the contestants can be sustained, and we therefore hold and decide that the $1,500 of undivided profits and surplus of the Albion County Bank stock belong to the life tenants, and that the acting executor was right in so stating it in his account, excepting, of course, the sum of $161.08 which had accrued on the stock at the time of the testator's death.

Some of the other objections to the account will now be considered. The item of $36 for postage and stationery is objected to. It does not seem possible that the correspondence necessary for the estate should require $12 for postage and stationery each year. I think $5 should be ample. The item of $36 should be changed to $15.

The item of $15 for work and services of the executor is allowed. While such charges are not favored by the courts, and are not to be encouraged, still in this particular instance the amount charged is reasonable, and the work was necessary for the preservation of the corpus of the estate, and the charge will be allowed to stand, although without intending to fix a precedent in relation to such items.

In Schedule G the item of $72.26 should be changed to $70.76. The error was an inadvertence.

. In the matter of commissions to the executor we do not think that in this case there has been such a separation of the functions of executor and trustee as to entitle him to double commissions, as was held in Matter of Union Trust Company, 70 App. Div. 5, 75 N. Y. Supp. 68, nor that commissions should be allowed on the corpus of the estate as well as income, as was done in the case of Drake v. Price, 5 N. Y. 430. If this practice were allowed in several successive annual accountings, the commissions would very perceptibly reduce the corpus of the estate, and in time eventually consume the whole of it. The executor will be allowed commissions on the income only (Matter of Kellogg, 7 Paige, 266) and payable out of the income. On the final accounting at the termination of the trust, no doubt, commissions would be allowed on the corpus of the estate.

·We have carefully examined the account of the executor as filed, which embraces about 350 items, and also the several objections thereto, and, except as above noted, we do not think that any of the objections require special consideration, and the account will be decreed to stand, except as to said corrections.

As to the expense of this accounting, I do not think that there is anything in the account, nor in the testimony, showing such mismanagement or lack of honesty or diligence on the part of the executor as to require us to hold that any part of the costs or expenses of this proceeding should be paid by him personally. In the case of Lowry v. Farmers' Loan & Trust Co., 172 N. Y. 145, 64 N. E. 796, the court decided that the costs of all parties should be paid out of the principal fund. In McLouth v. Hunt, 154 N. Y. 198, 48 N. E. 548, 39 L. R. A. 230, it was decreed that costs of all parties should be paid out of the income. As stated at the outset, while this is a voluntary accounting, and instituted by the executor's own petition, it is virtually a compulsory accounting at the instance of the remaindermen. There is nothing in the case, however, to indicate that the executor desired to either avoid or resist an accounting; but, as nearly three years have elapsed since there was an accounting, it was proper that another one should be had.

I think that the expenses of this accounting should be borne equally by the accountant and contestant; that is to say, one-half to be paid out of the corpus of the estate and one-half out of the income. A decree will be entered in accordance with this opinion.

Decreed accordingly.